**PETER J. NICKITAS LAW OFFICE, L.L.C.**
**PETER J. NICKITAS**
ATTORNEY AT LAW
431 S. 7TH STREET, SUITE 2446
P.O. BOX 15221
MINNEAPOLIS, MINNESOTA 55415-0221
TEL. 651.238.3445 – FAX 1.888.389.7890
EMAIL: PETERJNICKITASLAWLLC@GMAIL.COM, PeterN5@aol.com
LICENSED IN MINNESOTA AND WISCONSIN
GRAPHIC LABOR PROVIDED IN-HOUSE

23 April 2013

Mr. Michael Gans
Clerk of Court
United States Court of Appeals for the Eighth Circuit
United States Courthouse 24-239
110 S. 10th St.
St. Louis, Missouri 63101

Re: Scheffler v. Molin, 13-1008 (8th Cir. 2013)

VIA ECF

Dear Mr. Gans:

      This law firm represents appellant Troy Scheffler. In accordance with Fed. R. App. P. 28(j), Mr. Scheffler respectfully submits the following case, *Santiago v. Blair et al.,* ___ F.3d ___, ___11-3693, pp. 11 – 12 of 15 (8th Cir. Feb. 27, 2013), published after the filing of appellant's principal brief, and a case on which *Santiago* cites with approval, *Van Deelen v. Johnson*, 497 F.3d 1151, 1157 (10th Cir. 2007), and brings them to the court's attention, as they apply to Mr. Scheffler's arguments at pp. 13 – 14 of his reply brief relating to denial of First Amendment qualified immunity for verbal threats to engage, or threats resulting in actual engagement, of punitive police power, against a peaceful speaker or petitioner for redress of grievances, by a civilian government actor. I thank the court for its attention to this matter.

      Very truly yours,

      /s/ *Peter J. Nickitas*

      Peter J. Nickitas
      Attorney for Appellant

Enclosures
cc: Jana O'Leary Sullivan, attorney for the appellee
    Mr. Troy K. Scheffler

# United States Court of Appeals

## For the Eighth Circuit

_____

No. 11-3693

_____

Victor Santiago

*Plaintiff - Appellee*

v.

Daniel Blair, Lieutenant, Potosi Correctional Center, Individually and Officially;
Timothy Williford, Correctional Officer I, Potosi Correctional Center, Individually
and Officially; Andrew Fox, Correctional Officer I, Potosi Correctional Officer,
Individually and Officially; Garry Branch, Captain, Potosi Correctional Center,
Individually and Officially; Shannon Clubbs, Correctional Officer, Potosi
Correctional Center, Individually and Officially; David E. Parsons, Correctional
Officer, Potosi Correctional Center, Individually and Officially

*Defendants - Appellants*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 19, 2012
Filed: February 27, 2013 **(Corrected 02/27/13)**

_____

Before WOLLMAN, BEAM, and LOKEN, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Captain Garry Branch, Lieutenant Daniel Blair, and Correctional Officers Timothy Williford, Andrew Fox, Shannon Clubbs, and David E. Parsons (collectively Correctional Officers) appeal the district court's denial of their motion for summary judgment based upon qualified immunity. We affirm in part, reverse in part, and remand for further proceedings.

## I. Background

The facts in this case are heavily disputed. Because this is an appeal from the denial of the Correctional Officers' motion for summary judgment, the facts are taken in the light most favorable to plaintiff, Victor Santiago. Brown v. City of Golden Valley, 574 F.3d 491, 496 (8th Cir. 2009). In 2008, Santiago was an inmate at the Potosi Correctional Center, in Mineral Point, Missouri. On July 26, 2008, Santiago was scheduled to work kitchen duty but did not report for work, prompting Lieutenant Blair to initiate a search for him. Santiago was discovered in the recreational area and sent to the kitchen to report for duty. When Santiago arrived at the kitchen, Blair told him that he was being sent to administrative segregation for his failure to report to work and ordered him to "strip out." While he was stripping out, Santiago began arguing with Blair. Eventually, Blair approached Santiago with his handcuffs out and told Santiago that he was going to "kick his ass." Santiago assumed a defensive position and told Blair that if he touched him, Santiago was going to "drop him."

Blair ordered another correctional officer who was present to make a "10-5 call," which indicates that an officer needs assistance. As staff began to respond to the call, Blair persuaded Santiago to submit to being handcuffed. While he was placing the handcuffs on Santiago, Blair said "let me lock the safety, we wouldn't want [the handcuffs] to accidentally tighten on you." Blair then tightened the handcuffs to the "crushing point."

-2-

Correctional Officer Williford, who had responded to the 10-5 call, began leading Santiago to the medical unit, which was standard procedure prior to placing an inmate in administrative segregation. Williford began digging his fingers into Santiago's left arm, prompting Santiago to yell at Williford to stop "manhandling" him. Williford replied, "What are you going to do about it tough guy?" Santiago responded, "I'm not going to let you blow me no more." Williford immediately swung Santiago toward the wall, slamming the right side of his face and body into the wall. Correctional Officer Fox, who had also responded to the 10-5 call, sprayed Santiago with pepper spray. Santiago alleges that although he shifted his body to avoid directly hitting the wall, he did not attempt to escape Williford's grasp or resist in any fashion.

The correctional officers then threw Santiago to the floor and restrained his legs. Correctional Officer Parsons grabbed Santiago's legs, crossed them at the ankles and turned them upward in a torque position, holding them tightly until another correctional officer secured Santiago with leg restraints. Santiago again alleges that he was not resisting the correctional officers' actions. As Santiago was being lifted from the floor, Parsons took his left wrist and turned it upward with a sharp motion, dislocating it.

Parsons led Santiago to the medical unit, where he was seen by a nurse. The nurse asked Parsons whether Santiago's handcuffs could be loosened. Santiago alleges that he heard Captain Branch respond, "No, he's fine." The nurse treated Santiago for a laceration on his left wrist. Santiago alleges that he complained to the nurse about his dislocated left wrist, but the nurse did nothing to address it. The medical records from Santiago's visit do not indicate any complaint regarding a dislocated wrist. The nurse told Parsons and Branch that Santiago would need to take a shower to wash the pepper spray from his hair and face. Branch responded, "Leave him, maybe he'll think twice before threatening one of us." Santiago was forced to wait thirty-five minutes before being placed in a shower.

-3-

Following his treatment in the medical unit, Santiago was placed in administrative segregation in House 1. Several hours later, Santiago made a self-declared medical emergency call to have a nurse examine his wrist. The responding nurse was the same person who had treated Santiago earlier. Santiago told the nurse that he thought his wrist might be broken. The nurse looked at his wrist, responded, "it don't look broke to me," and walked away from the cell. Thereafter, Santiago reset his wrist himself, using his sock and the handicap bar in his cell.

Santiago filed a grievance on November 5, 2008, alleging that the correctional officers had used excessive force during the incident in question. This grievance was denied, and Santiago's appeal from the denial was found to be without merit on February 19, 2009. During the grievance process, Santiago remained in administrative segregation. Santiago alleges that on February 22, 2009, Correctional Officer Clubbs spoke to him about his excessive force grievance, telling Santiago that he "would be smart to just drop it." When Santiago responded that he would not drop the issue, Clubbs told him "if you know what is good for you, you will leave Lieutenant Blair out of it." Clubbs continued, saying, "maybe a couple more years in the hole will knock that tough ass attitude out of you, I can make that happen or maybe we'll find you hanging in one of these cells." Clubbs began laughing and then said, "think about it."

Several days later, Clubbs noticed that Santiago had placed a sheet in the crack of his cell door. Clubbs attempted to pull the sheet through the door but was unable to do so because Santiago had tied a knot at the end of it. Santiago pulled the sheet back into his cell and refused to give it to Clubbs. During this exchange, the metal food flap on the cell door was knocked off and struck Clubbs's hand. Santiago was given a conduct violation for this incident and was moved to a different administrative segregation cell without his personal property. This cell did not have a mattress, working sink, or working toilet. Santiago was given a single sheet and was left wearing only his boxer shorts. When Santiago protested the conditions and

-4-

asked why he was being treated this way, he was told that it was "per Lieutenant Blair" and until he "learned how to act" he would not receive his property or better living conditions. Later that afternoon, Santiago received the paper work for his conduct violation. Approximately twenty minutes later, Clubbs stopped by his new cell and said, "I told you," and "the next paper work is for your suicide."

The following day, another correctional officer asked Santiago why he had been moved to the new cell. Santiago explained that he had been subjected to an excessive use of force, filed a grievance, and refused to drop the grievance after being threatened by Clubbs, all of which resulted in what Santiago believed was retaliation in the form of an unfounded conduct violation and his transfer to his current cell. When he finished telling the correctional officer this story, the officer stepped aside, shaking his head. Blair stepped into view, saying, "you just ain't going to learn." He then told Santiago that "things are going to get worse." The next day, however, Santiago was moved back to House 1 and placed in a close observation cell. One week later, Santiago appeared before a disciplinary action board for a hearing on the conduct violation issued by Clubbs. The violation was upheld and Santiago received additional time in administrative segregation.

Santiago filed the instant action against the Correctional Officers in their official and individual capacities under 42 U.S.C. § 1983, alleging excessive force and deliberate indifference to his medical needs in violation of the Eighth Amendment and retaliation in violation of the First Amendment. The Correctional Officers moved for summary judgment, contending that they were entitled to sovereign immunity regarding the official capacity claims and qualified immunity regarding the individual capacity claims. The district court granted summary judgment to the Correctional Officers with respect to the official capacity claims, but denied summary judgment with respect to the individual capacity claims.

Appellate Case: 13-1008     Page: 6     Date Filed: 04/23/2013 Entry ID: 4028263

## II. Discussion

We review *de novo* a district court's denial of a motion for summary judgment based on qualified immunity. Akins v. Epperly, 588 F.3d 1178, 1182 (8th Cir. 2009). "We view the facts in the light most favorable to the plaintiff, accepting as true the facts that the district court found were adequately supported, as well as the facts the district court likely assumed." Brown, 574 F.3d at 496.

Determining the question of qualified immunity involves the following two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right; and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. Saucier v. Katz, 533 U.S. 194, 201 (2001), *overruled in part by* Pearson v. Callahan, 555 U.S. 223, 236 (2009) (holding that Saucier's two-step sequence is not mandatory). "Under the rule established in Pearson, we have the discretion to decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" Fields v. Abbott, 652 F.3d 886, 890 (8th Cir. 2011) (quoting Pearson, 555 U.S. at 236).

### A. Excessive Force

When confronted with a claim of excessive force alleging a violation of the Eighth Amendment, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992) (citing Whitley v. Albers, 475 U.S. 312, 320-21 (1986)). "The Supreme Court recently clarified that the extent of any resulting injury, while material to the question of damages and informative as to the likely degree of force applied, is not in and of itself a threshold requirement for proving this type of Eighth Amendment claim." Williams v. Jackson, 600 F.3d 1007, 1012 (8th Cir. 2010) (citing Wilkins v. Gaddy, 559 U.S. 34, 130 S. Ct. 1175, 1178-79 (2010) (per curiam)).

-6-

Santiago's amended complaint alleges that Blair, Williford, Fox, and Parsons used excessive force during the July 26, 2008, incident. In addressing Santiago's Eighth Amendment excessive force claim, the district court applied the Fourth Amendment excessive force legal standard. See D. Ct. Order of Nov. 10, 2011, at 24-25 (citing Rohrbough v. Hall, 586 F.3d 582, 585-86 (8th Cir. 2009)). In Johnson v. Bi-State Justice Center/Arkansas Department of Corrections, 12 F.3d 133, 136 (8th Cir. 1993), we held that the district court's use of the incorrect legal standard in its analysis of an inmate's Eighth Amendment excessive force claim was reversible error. Because the inmate had created a prison disturbance requiring some use of force, we remanded the issue for a determination whether the inmate's "testimony, viewed in light of other relevant factors such as the extent of [his] injury and the security threat reasonably perceived by defendants, '[would] support a reliable inference' of an unnecessary and wanton infliction of pain." Id. at 136-37.

Similarly, the record here demonstrates that Santiago failed to appear at work and then threatened "to drop" a correctional officer while assuming a defensive position, an action that necessitated a call for assistance. The correctional officers facing this situation could apply reasonable force to subdue Santiago and move him to administrative segregation. Santiago testified that he voluntarily submitted to being handcuffed and that although he made at least one disparaging remark to Williford, he did not physically resist the correctional officers' actions. As in Johnson, the question that must be answered is whether this testimony, in light of the surrounding circumstances, is sufficient to support an inference of an unnecessary and wanton infliction of pain. This is a question that "must be answered in the first instance by the district court, applying the correct excessive force standard and avoiding the improper resolution of credibility issues." Id. at 137. Accordingly, on remand the district court must address Santiago's excessive force claim in light of the standard set forth in Johnson.

-7-

## B. Deliberate Indifference

To establish a claim of deliberate indifference to serious medical needs under § 1983, Santiago must demonstrate that he suffered from an objectively serious medical need and that Branch actually knew of but deliberately disregarded the need. Johnson v. Hamilton, 452 F.3d 967, 972-73 (8th Cir. 2006). A serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995) (internal quotation marks and citation omitted).

Santiago's amended complaint alleges that Branch was deliberately indifferent to his serious medical needs with respect to the treatment of his wrist and the delay in permitting him to enter the shower. Branch moved for summary judgment on the deliberate indifference claim, addressing both treatment issues raised by Santiago. The district court denied Branch's motion, finding that genuine disputes of material fact existed that precluded summary judgment. See D. Ct. Order of Nov. 10, 2011, at 25-26. The district court's order did not conduct a separate analysis of each treatment issue, but did discuss both allegations in the facts section of the order. See id. at 15-17.

Branch's appeal focuses solely on the district court's denial of qualified immunity regarding the treatment of Santiago's dislocated wrist. Assuming that Santiago's dislocated wrist was an objectively serious medical need, Branch is still entitled to qualified immunity because there is no evidence in the record that he deliberately disregarded that need. The only allegation regarding this issue is that Branch refused to loosen Santiago's handcuffs. Santiago would have us believe that it was Branch's action that prevented Santiago from receiving treatment on his wrist. The record does not support such a claim, however, for Branch's refusal to loosen the handcuffs did not prevent the nurse from treating the laceration on Santiago's wrist. Further, there is no evidence that the presence or tightness of the handcuffs prevented

-8-

the nurse from treating the dislocation, as the nurse reexamined Santiago's uncuffed wrist several hours later and still concluded that it did not warrant further medical treatment. Accordingly, Branch is entitled to qualified immunity regarding this claim of deliberate indifference.[1]

## C. Retaliation

The right to be free from retaliation for availing one's self of the prison grievance process has been clearly established in this circuit for more than twenty years. Nelson v. Shuffman, 603 F.3d 439, 449-50 (8th Cir. 2010). To prevail on a § 1983 claim for retaliation in violation of the First Amendment, Santiago must demonstrate (1) that he engaged in a protected activity; (2) that the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated at least in part by the exercise of the protected activity. Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004).

Santiago's amended complaint alleges that Clubbs and Blair retaliated against him in violation of the First Amendment for filing and pursuing his excessive force grievance.[2] Clubbs and Blair do not dispute that Santiago's use of the prison grievance process satisfies the first prong under Revels. See Haynes v. Stephenson,

_____

[1] Branch did not raise, either in his briefs or at oral argument, the district court's adverse ruling with respect to Santiago's deliberate indifference claim premised on the thirty-five minute delay in taking a decontamination shower. Accordingly, Branch has waived any claim of error regarding the district court's ruling on that claim, see United States v. Maxwell, 643 F.3d 1096, 1103 n.5 (8th Cir. 2011), and we need not address it on appeal.

[2] At oral argument, counsel for Santiago asserted that the claim of retaliation was a general claim brought under the Due Process Clause of the Fourteenth Amendment. Santiago's amended complaint, however, makes clear that he has alleged only a claim for retaliation in violation of the First Amendment.

-9-

588 F.3d 1152, 1155-56 (8th Cir. 2009) ("The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity." (internal quotation marks and citation omitted)). We address separately the remaining two prongs with respect to the allegations against Clubbs and Blair.

### i. Clubbs

Santiago alleges that Clubbs subjected him to two adverse actions: first, he threatened Santiago's life and, second, he falsified a conduct violation report. Looking first to the alleged death threats, Santiago has produced evidence that Clubbs made at least two statements implying that if Santiago did not drop his excessive force grievance against Blair, he would be found hanging in his cell and that his death would be made to look like a suicide.

We have long held that "a threat of retaliation is sufficient injury if made in retaliation for an inmate's use of prison grievance procedures" to sustain a claim of First Amendment retaliation. Burgess v. Moore, 39 F.3d 216, 218 (8th Cir. 1994). This is true especially when the threats are ones of death or serious harm to an inmate's safety. See, e.g., Burton v. Livingston, 791 F.2d 97, 100-01 (8th Cir. 1986) (holding that allegations that a prison guard retaliated against a prisoner by terrorizing him with threats of death, if proved, would constitute a violation of the prisoner's First Amendment rights); Cooper v. Schriro, 189 F.3d 781, 784 (8th Cir. 1999) (per curiam) (holding that threats to an inmate's safety after his use of the prison grievance system supported a retaliation claim).

As set forth earlier, under Revels a prisoner must demonstrate not only that a correctional officer took an adverse action, but that the action "would chill a person of ordinary firmness from continuing in the [protected] activity." 382 F.3d at 876. "The ordinary-firmness test is well established in the case law, and is designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment." Garcia v. City of Trenton, 348 F.3d

-10-

726, 728 (8th Cir. 2003). We have adopted the "ordinary-firmness" requirement for First Amendment claims of retaliation, see id., and have applied it in the First Amendment prisoner retaliation context, see Lewis v. Jacks, 486 F.3d 1025, 1029 (8th Cir. 2007) (holding that the record contained insufficient evidence that increasing the prisoner's work load would chill a prisoner of ordinary firmness from using the prison grievance process).

The "ordinary-firmness" test is an "objective one, not subjective." Garcia, 348 F.3d at 729. In determining whether threats of death would chill a prisoner of ordinary firmness from using the prison grievance process, "[t]he question is not whether [Santiago himself] was deterred, though how [Santiago] acted might be evidence of what a reasonable [prisoner] would have done." Id. Rather, the test is what a prisoner of ordinary firmness would have done in reaction to the death threats. Id. "Ultimately, this sort of question is usually best left to the judgment of a jury . . . ." Id.

In the circumstances before us, we conclude that a reasonable jury could find that threats of death, issued by a correctional officer tasked with guarding a prisoner's segregated cell, would chill a prisoner of ordinary firmness from engaging in the prison grievance process. See Hill v. Lappin, 630 F.3d 468, 474 (6th Cir. 2010) ("[T]hreats alone can constitute an adverse action if the threat is capable of deterring a person of ordinary firmness from engaging in protected conduct."); Van Deelen v. Johnson, 497 F.3d 1151, 1157 (10th Cir. 2007) (holding that the plaintiff's "allegations of physical and verbal intimidation, including a threat by a deputy sheriff to shoot him if he brought any more tax appeals, would surely suffice . . . to chill a person of ordinary firmness from continuing to seek redress for (allegedly) unfair property tax assessments").

Further, there is sufficient evidence of a causal connection between Santiago's use of the grievance process and Clubbs's death threats to satisfy the third Revels prong. To satisfy the causal connection prong, "the plaintiff must show the official

-11-

took the adverse action because the plaintiff engaged in the protected speech." Revels, 382 F.3d at 876. The record indicates that Santiago's excessive force grievance was officially denied on January 2, 2009, and that his appeal was denied on February 19, 2009. The conversation during which Clubbs threatened Santiago to drop his claim of excessive force or risk being found hanging in his cell occurred three days later, while Santiago was at a crossroads regarding whether to continue pursuing his claim in the courts. In these circumstances, a reasonable jury could conclude that Clubbs issued the death threats because Santiago had filed and pursued his excessive force grievance. Thus, Clubbs is not entitled to qualified immunity regarding the retaliatory death threats.

Looking next to the allegation that Clubbs filed a false retaliatory conduct violation against Santiago, we conclude that the claim is without merit. "A prisoner has a cause of action when the prisoner alleges that prison officials filed disciplinary charges based upon false allegations against the prisoner in retaliation for the prisoner's participation in grievances against prison officials." Henderson v. Baird, 29 F.3d 464, 469 (8th Cir. 1994). "However, claims of retaliation fail if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule." Hartsfield v. Nichols, 511 F.3d 826, 829 (8th Cir. 2008). "Thus, a defendant may successfully defend a retaliatory discipline claim by showing 'some evidence' the inmate actually committed a rule violation." Id. Under this standard, "a report from a correctional officer, even if disputed by the inmate and supported by no other evidence, legally suffices as 'some evidence' upon which to base a prison disciplinary violation, if the violation is found by an impartial decisionmaker." Id. at 831. It is undisputed that Clubbs filed a report detailing Santiago's alleged assault and that Santiago was brought before a disciplinary action board for a hearing at which he was found guilty of assault. Accordingly, Santiago's claim of retaliatory discipline fails as a matter of law and Clubbs is entitled to qualified immunity with respect to this alleged retaliatory action.

-12-

### ii. Blair

Santiago alleges that Blair subjected him to two adverse actions: first, he placed Santiago in a cell without his personal property, bedding, running water, or a working toilet and, second, he threatened him with further retaliation. Blair contends that the conditions of Santiago's cell cannot support a cause of action under § 1983 because they did not create an atypical and significant hardship on Santiago as required under Sandin v. Conner, 515 U.S. 472 (1995). Blair misconstrues Santiago's claim. Sandin would be applicable if Santiago were alleging a conditions of confinement claim under the Due Process Clause. Santiago's claim, however, is clearly one for retaliation under the First Amendment, a claim that Sandin specifically left open. See Sandin, 515 U.S. at 487 n.11 ("Prisoners . . . retain other protection from arbitrary state action even within the expected conditions of confinement. They may invoke the First and Eighth Amendments and the Equal Protection Clause of the Fourteenth Amendment where appropriate, and may draw upon internal prison grievance procedures and state judicial review where available.").

Santiago alleges that following the incidents with Clubbs he was moved to a cell without his personal property, bedding, running water, or a working toilet. He was forced to sleep in this cell with a single blanket, wearing only his boxer shorts. Santiago further alleges that immediately after hearing Santiago complain that he was being retaliated against because of his pursuit of his excessive force grievance, Blair stepped in front of Santiago's cell door, saying, "things are going to get worse." Whether these conditions and this statement are themselves a constitutional violation is irrelevant. A prisoner has the "right under the First Amendment to petition for redress of grievances under a prison's grievance procedures[,]" Nelson, 603 F.3d at 449, and "conduct that retaliates against the exercise of a constitutionally protected right . . . is actionable even if the alleged retaliatory conduct does not itself rise to the level of a constitutional violation[,]" Van Wyhe v. Reisch, 581 F.3d 639, 658 (8th Cir. 2009).

-13-

We have held that deprivations and threats such as those allegedly made by Blair are sufficient to support a First Amendment retaliation claim. See, e.g., Nelson, 603 F.3d at 450 (holding that the plaintiff who allegedly was held in isolation in a structurally unfinished and inadequate ward and deprived of access to legal counsel, mail, family, recreation, and phone calls had demonstrated sufficient deprivations to survive summary judgment on a First Amendment retaliation claim); Cooper, 189 F.3d at 784 (allegation that the correctional officer shut off water for five days because the prisoner used the prison grievance system was sufficient to state a retaliation claim); Burgess, 39 F.3d at 218 (threat made in retaliation for a prisoner's use of the prison grievance system is sufficient to state a First Amendment retaliation claim). A reasonable jury could conclude that Blair's placement of Santiago in a cell without his personal property, proper facilities, bedding, or clothing and Blair's threat that things would get worse, issued after hearing Santiago complain that he was being retaliated against, are adverse actions sufficient to chill a prisoner of ordinary firmness from engaging in the prison grievance process. See Thaddeus-X v. Blatter, 175 F.3d 378, 398 (6th Cir. 1999) (holding that "[h]arassment, physical threats, and transfer to the area of the prison used to house mentally disturbed inmates, especially combined with the conditions allegedly present there," would likely deter a prisoner of ordinary firmness from exercising a right to access the courts).

Santiago has also satisfied the causal connection prong regarding the two adverse actions taken by Blair. See Revels, 382 F.3d at 876. When Santiago was first placed in the cell, he asked the correctional officer why he was being placed in a cell without his personal property, proper bedding, a working sink, or a working toilet. The correctional officer responded, "That's per Lieutenant Blair. Until you learn how to act, you're not going to get any of those things." Blair's threat that things would get worse was issued the following day immediately after hearing Santiago complain that his placement in the cell was retaliation for pursuing his grievance. Taken in the light most favorable to Santiago, a reasonable jury could conclude that these facts demonstrate that Blair took the above-described adverse actions because of Santiago's continued use of the prison grievance procedure. Thus, Blair is not entitled to qualified immunity on Santiago's retaliation claim.

-14-

### III. Conclusion

We affirm that portion of the district court's order which denied qualified immunity with respect to Santiago's deliberate indifference claim against Branch for the delay in allowing Santiago to wash off the pepper spray, the retaliation claim against Clubbs for the retaliatory death threats, and  the retaliation claim against Blair.  We reverse that portion of the district court's order which denied qualified immunity with respect to the excessive force claim against Blair, Williford, Fox, and Parsons, the deliberate indifference claim against Branch for the treatment of Santiago's wrist, and the retaliation claim against Clubbs for filing a false conduct violation.

The case is remanded to the district court for further proceedings in accordance with the views set forth in this opinion.

_____

Appellate Case: 13-1008     Page: 16     Date Filed: 04/23/2013 Entry ID: 4028263

**497 F.3d 1151 (2007)**

## Michael D. VAN DEELEN, Plaintiff-Appellant,

v.

## Marion JOHNSON; Steven Miles; Dale Flory; Kenneth Fangohr; Ken McGovern; and Board of County Commissioners of Douglas County, Kansas, Defendants-Appellees.

No. 06-3305.

**United States Court of Appeals, Tenth Circuit.**

August 14, 2007.

1152   *1152 Michael D. **Van Deelen**, filed a brief pro se.

Nicholas P. Heinke of Hogan & Hartson, Denver, CO, for Plaintiff-Appellant.

Peter T. Maharry (Michael K. Seck and Daniel P. Goldberg on the brief), of Fisher, Patterson, Sayler & Smith, Overland Park, KS, for Defendants-Appellees.

Before HARTZ, McKAY, and GORSUCH, Circuit Judges.

1153   *1153 GORSUCH, Circuit Judge.

Michael D. **Van Deelen** alleges that the Board of County Commissioners of Douglas County, Kansas, as well as five county officials, violated his First Amendment rights by seeking to threaten and intimidate him into dropping various tax assessment challenges. The United States District Court for the District of Kansas, in reliance on a number of its prior holdings, granted summary judgment for the defendants on the basis that Mr. **Van Deelen's** tax challenge was not a matter of "public concern." We write today to reaffirm that the constitutionally enumerated right of a private citizen to petition the government for the redress of grievances does not pick and choose its causes but extends to matters great and small, public and private. Whatever the public significance or merit of Mr. **Van Deelen's** petitions, they enjoy the protections of the First Amendment. Accordingly, we reverse and remand.

# I

# A

Viewing the facts pertinent to the current dispute, as we must, in the light most favorable to Mr. **Van Deelen** as the party opposing summary judgment,[1] his tangle with the County began in 1991. That year, Mr. **Van Deelen** purchased a home that, shortly after the transaction settled, suffered from repeated flooding. After a particularly severe episode in 1993, Mr. **Van Deelen** sued the County and the City of Eudora, in which the home is located, complaining that a nearby culvert was undersized and

Appellate Case: 13-1008      Page: 17      Date Filed: 04/23/2013 Entry ID: 4028263

contributing to the flooding. The County and City eventually paid him a sum for his damages and replaced the culvert with a bridge; thereafter, Mr. **Van Deelen** dismissed his suit.

Beginning in 2000, Mr. **Van Deelen** believed that the County's annual increases in the assessed value of his home unfairly overstated his home's true market value, in part by inadequately accounting for what he perceived to be a continuing threat of flooding. During the next several years, he unsuccessfully appealed the County's assessments at approximately eight different administrative hearings. In the course of these appeals, Mr. **Van Deelen** interacted frequently with both Marion **Johnson**, the County Appraiser, and Steven Miles, an appraiser in Mr. **Johnson's** office. Bad blood soon set in.

In one 2002 hearing, Mr. **Van Deelen** allegedly made "accusatory" and "derogatory" remarks towards Mr. Miles that prompted the hearing officer to discontinue the proceedings. In spite of this incident, Mr. Miles agreed to meet again with Mr. **Van Deelen** the following week at the Appraiser's office, located in the old Douglas County Courthouse. Before that meeting, however, Mr. Miles expressed to Mr. **Johnson** his concern about Mr. **Van Deelen's** behavior; in turn, Mr. **Johnson** asked the Sheriff's Department to assign one of its deputies to be available outside the Appraiser's office during the meeting. As it indeed turned out, when Mr. **Van Deelen** and Mr. Miles met at the appointed time, Mr. **Johnson**, who was close by Mr. Miles's office, perceived the tone to grow increasingly loud and disruptive. Eventually, Mr. **Johnson** decided to interrupt and terminate the meeting, and did so with the
1154  assistance of Sergeant Kenneth Fangohr, *1154 the member of the Sheriff's Department assigned to provide the requested security.

Mr. **Van Deelen** continued to dispute the County's tax assessments and, in February 2005, filed suit in federal court, naming as defendants Mr. Miles, Mr. **Johnson**, and the County, and alleging, among other things, unconstitutional property valuations and perjury by Mr. Miles in his testimony at administrative hearings. Not long after in March 2005, the County reduced by $5,000 the assessed value of Mr. **Van Deelen's** home, and Mr. **Van Deelen** dismissed the suit.[2]

But this was hardly the end of the matter. Mr. **Van Deelen** pursued yet another tax appeal with the Appraiser's office in late March 2005, even after the resolution of his federal lawsuit. A meeting was scheduled, and Mr. **Johnson** again requested that someone from the Sheriff's office attend; this time, however, he asked the Sheriff's representative to sit inside, not outside, the meeting room. Because Sergeant Fangohr was unavailable that day, the job went to Deputy Dale Flory. While defendants submit that the deputy was present simply to ensure that the meeting did not get out of control, Mr. **Van Deelen** alleges that the deputy's attendance was calculated to intimidate him in retaliation for his lawsuits and appeals and to deter him from bringing future appeals.

Indeed, Mr. **Van Deelen** alleges that, upon his arrival at the meeting, Mr. Miles stated that "[t]oday you get payback for suing us." Mr. **Van Deelen** further alleges that Deputy Flory pulled his chair right next to Mr. **Van Deelen**, deliberately "bumping" Mr. **Van Deelen's** arm and leg with his own in the process. Mr. **Van Deelen** asserts that the deputy's presence surprised and frightened him. When he asked why the deputy was there, Mr. Miles responded that Deputy Flory had come at the request of Mr. **Johnson** based upon plaintiff's prior behavior. Mr. **Van Deelen** alleges that Deputy Flory repeatedly and

Appellate Case: 13-1008      Page: 18      Date Filed: 04/23/2013   Entry ID: 4028263

intentionally "bumped" him throughout the meeting, and that when Mr. **Van Deelen** looked up, Deputy Flory held his hand on his gun and made menacing looks. Mr. **Van Deelen** also alleges that Mr. Miles "brow beat" him throughout the meeting by scowling and staring. After "an exchange of words," including threats by Mr. **Van Deelen** to file another lawsuit, Mr. Miles ended the meeting. Mr. **Van Deelen** contends that Deputy Flory then stood up and told him to leave. During this exchange, Deputy Flory also allegedly poked Mr. **Van Deelen's** chest with his finger and stated: "Don't come back. **Johnson** and Miles are mad because you sued them. They told me to do whatever necessary to put a scare into you. If you show up for another tax appeal hearing, I might have to shoot you." Deputy Flory then told Mr. **Van Deelen** to leave immediately, not allowing him to collect his tax papers.

Mr. **Van Deelen** claims this episode has deterred him from his continued pursuit of tax appeals at the Appraiser's office.[3] As evidence, he presents a letter he sent to the Kansas Board of Tax Appeals in November 2005, cancelling his requested hearing and citing the threat of violence by the County as the reason for doing so. Seeking compensation for his alleged injuries, as well as injunctive and declaratory relief, Mr. **Van Deelen** brought suit in *1155 federal district court against Mr. **Johnson**, Mr. Miles, Deputy Flory, Sergeant Fangohr, Sheriff Ken McGovern, and the County Board of Commissioners. Mr. **Van Deelen's** suit alleges various violations of the First and Fourteenth Amendments, actionable by means of 42 U.S.C. § 1983, as well as various violations of state tort law.

1155

## B

In due course, the district court entertained and granted defendants' motion for summary judgment with respect to all of Mr. **Van Deelen's** federal constitutional claims. With respect to his First Amendment claims, the district court held, *inter alia,* that Mr. **Van Deelen's** pursuit of legal and administrative remedies against the County relating to his tax assessments failed to qualify as protected constitutional conduct because it did not implicate matters of public concern and instead "aimed only at advancing [his] financial interest and achieving only redress for [his] private grievances." 2006 WL 1764381 at *5. The district court also disposed of Mr. **Van Deelen's** Fourteenth Amendment claims, finding a lack of evidence of any substantive or procedural due process violation and no basis for asserting a violation of equal protection; it similarly found no merit to Mr. **Van Deelen's** invasion of privacy and § 1983 conspiracy claims. Having thus extinguished his federal claims, the court dismissed without prejudice Mr. **Van Deelen's** remaining pendent state law claims pursuant to 28 U.S.C. § 1367(c).

Mr. **Van Deelen** filed a timely notice of appeal seeking reversal of the district court's disposition on all but two matters: he does not challenge the court's dismissal of the equal protection and invasion of privacy claims. Mr. **Van Deelen** further conceded at oral argument that his appeal on First Amendment grounds pertains only to Mr. Miles, Mr. **Johnson**, and Deputy Flory, and that he does not appeal the district court's conclusion that he lacks evidence of retaliatory conduct by Sergeant Fangohr or Sheriff McGovern. Our primary and initial focus in this case, thus, concerns Mr. **Van Deelen's** claim that Mr. Miles, Mr. **Johnson**, and Deputy Flory unlawfully retaliated against him for engaging in protected First Amendment petitioning activity.

Appellate Case: 13-1008    Page: 19    Date Filed: 04/23/2013    Entry ID: 4028263

## II

The promise of self-government depends on the liberty of citizens to petition the government for the redress of their grievances. When public officials feel free to wield the powers of their office as weapons against those who question their decisions, they do damage not merely to the citizen in their sights but also to the First Amendment liberties and the promise of equal treatment essential to the continuity of our democratic enterprise. "The very idea of a government, republican in form, implies a right on the part of its citizens . . . to petition for a redress of grievances." _United States v. Cruikshank_, 92 U.S. 542, 552, 23 L.Ed. 588 (1875); _see also_ _United Mine Workers v. Ill. State Bar Ass'n_, 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) (The right to petition is "among the most precious of the liberties safeguarded by the Bill of Rights.").

To make out a claim of unlawful retaliation by government officials in response to the exercise of his or her First Amendment right to petition, we have indicated three elements must be present. The plaintiff must show that (a) he or she was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (c) the defendant's adverse action was substantially motivated 1156 as a response to the plaintiff's exercise of constitutionally protected *1156 conduct. _See_ _Worrell v. Henry_, 219 F.3d 1197, 1212 (10th Cir.2000). We address each element in turn.

## A

The defendants argue vigorously that Mr. **Van Deelen's** lawsuits and administrative appeals do not amount to "constitutionally protected activity" and thus fail the first prong of the _Worrell_ test. This is so, defendants submit, because Mr. **Van Deelen's** activity involved only private tax disputes and not issues of "public concern." We cannot agree.

One might well (as defendants do) question the merits of Mr. **Van Deelen's** petitions or their significance, arising as they do from an ongoing and increasingly personal spat with County tax officials. But a private citizen exercises a constitutionally protected First Amendment right _anytime_ he or she petitions the government for redress; the petitioning clause of the First Amendment does not pick and choose its causes. The minor and questionable, along with the mighty and consequential, are all embraced. This is, of course, not to say that the "public concern" test proffered by defendants and adopted by the district court has no place in the law of the First Amendment. Rather, the test quite properly applies to claims brought by government employees — but its scope reaches no further.

Because of the government's need to maintain an efficient workplace in aid of the public's business, the Supreme Court has long recognized that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." _Pickering v. Bd. of Educ._, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Accordingly, the Court has held, the government may in some instances employ constraints on the speech and activities of employees that would be unconstitutional if applied to private

Appellate Case: 13-1008      Page: 20      Date Filed: 04/23/2013   Entry ID: 4028263

citizens.[4] Still, even in the public workplace context, the Supreme Court has sought to balance the employees' rights as citizens with the government's interests as employer; because expression relating to issues of public concern "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection," _Connick v. Myers,_ 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (internal quotation marks omitted), speech affecting such matters remains protected even for government employees.[5]

The public concern test, then, was meant to form a sphere of protected activity for public employees, not a constraining noose around the speech of private citizens. To apply the public concern test outside the public employment setting would require us to rend it from its animating *1157 rationale and original context. Admittedly, defendants point us to a considerable line of cases from the District of Kansas appearing to do just this.[6] But these holdings are neither compelled by nor consistent with the First Amendment. As we have explained, "it is the government's powers and responsibilities _as an employer_ that warrant restrictions on speech," including the public concern requirement, _"that would not be justified in other contexts." Worrell,_ 219 F.3d at 1210 (emphases added). And as our sister circuits have put the point, "[t]he story of the public concern limitation is a story about the free speech of public employees," _Thaddeus-X v. Blatter,_ 175 F.3d 378, 390 (6th Cir.1999) (en banc), and any attempt to apply it to the broader context of speech by private citizens quite mistakenly "curtail a significant body of free expression that has traditionally been fully protected under the First Amendment," _Eichenlaub v. Twp. of Indiana,_ 385 F.3d 274, 282 (3d Cir.2004).[7]

## B

Under _Worrell_'s second requisite, Mr. **Van Deelen** must show that the defendants' actions caused him "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity." 219 F.3d at 1212. If accepted as credible by a jury, Mr. **Van Deelen's** allegations of physical and verbal intimidation, including a threat by a deputy sheriff to shoot him if he brought any more tax appeals, would surely suffice under our precedents to chill a person of ordinary firmness from continuing to seek redress for (allegedly) unfair property tax assessments. _See, e.g., Perez v. Ellington,_ 421 F.3d 1128, 1132 (10th Cir.2005) (finding the rushed imposition of tax assessments and a delay in removing tax liens after their abatement sufficient to chill a person of ordinary firmness from continuing in constitutionally protected activity). Further, Mr. **Van Deelen** presented evidence of his actual injury; his deposition testimony and his letter to the Board of Tax Appeals suggest that defendants' actions did, in fact, deter him from further tax appeals. Of course, a jury is free to find Mr. **Van Deelen's** evidence unpersuasive or incredible, but that is the function of the fact finder, not this court, in our judicial system.

## C

Finally, Mr. **Van Deelen** must show that defendants' "adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." _Worrell,_ 219 F.3d at 1212. In

Appellate Case: 13-1008    Page: 21    Date Filed: 04/23/2013    Entry ID: 4028263

aid of this cause, Mr. **Van Deelen** points us to Mr. Miles's alleged statement, "Today you get payback for suing us," and Deputy Flory's alleged statement, "**Johnson** and Miles are mad because you sued them." Although defendants deny making *1158 these statements, and the jury is free to so find, we cannot dispute that a reasonable jury could infer from them an impermissible retaliatory motive. *See, e.g., DeLoach v. Bevers,* 922 F.2d 618, 620 (10th Cir.1990) (finding sufficient evidence of retaliatory motive from police detective's statement: "Payback is hell, that's what she got for hiring a smart-ass lawyer.").

## III

Defendants suggest that, even if Mr. **Van Deelen** satisfies *Worrell*'s tripartite test and might otherwise have a triable retaliation claim for interference with his right to petition, they are entitled to qualified immunity. When a defendant asserts qualified immunity, the responsibility shifts to the plaintiff to meet the burden of demonstrating first, that the defendant's actions, viewed here through the prism of our summary judgment standard and thus examined in the light most favorable to the plaintiff, violated a constitutional or statutory right; and, second, that the right at issue was clearly established at the time of the defendant's allegedly unlawful conduct. *Casey v. West Las Vegas Ind. Sch. Dist.,* 473 F.3d 1323, 1327 (10th Cir.2007); *Phillips v. James,* 422 F.3d 1075, 1080 (10th Cir.2005). If the plaintiff fails to satisfy either part of this two-part test, we grant qualified immunity. *Casey,* 473 F.3d at 1327.[8]

We believe Mr. **Van Deelen** has overcome both qualified immunity hurdles. As we have already indicated, Mr. **Van Deelen** has alleged facts from which a reasonable jury could (though need not necessarily) conclude that a violation of the First Amendment took place. And the right at issue — to petition the government for the redress of tax grievances — has been with us and clearly established since the Sons of Liberty visited Griffin's Wharf in Boston. Defendants respond by pointing us again to the line of cases from Kansas district courts, *see supra* note 6, arguing that it "muddied the water" sufficiently that a reasonable official would not have known that private citizens have a First Amendment right to petition on private as well as public matters. But every case discussing the public concern test in the Supreme Court has made pellucid that it applies only to public employees. *See, e.g., Connick,* 461 U.S. at 143-49, 103 S.Ct. 1684; *Waters,* 511 U.S. at 671-82, 114 S.Ct. 1878; *City of San Diego,* 543 U.S. at 80-84, 125 S.Ct. 521; *Garcetti,* 126 S.Ct. at 1957-62. The same is true of our own precedent. *See, e.g., Martin v. City of Del City,* 179 F.3d 882, 886 (10th Cir.1999) (explicitly stating six times within a single page that the public concern test applies specifically to claims by public employees); *Schalk v. Gallemore,* 906 F.2d 491, 494-95 (10th Cir. 1990); *Burns v. Bd. of County Comm'rs,* 330 F.3d 1275, 1285-86 (10th Cir.2003). And none of our published opinions concerning the right of petition by private citizens has even hinted at a public concern requirement. *See, e.g., Beedle v. Wilson,* 422 F.3d 1059, 1065-67 (10th Cir.2005); *Malik v. Arapahoe County Dep't of Soc. Servs.,* 191 F.3d 1306, 1315 (10th Cir.1999); *DeLoach,* 922 F.2d at 620; *Penrod v. Zavaras,* 94 F.3d 1399, 1404-06 (10th Cir. 1996). The same is true of our sister circuits. *See supra* pp. 1156-57 and note 7. Reliance on district court and unpublished decisions in the face of such uniform governing authority from the Supreme *1159 Court, as well as this circuit and every other circuit to have addressed the question, is not sufficient to avoid liability.

Appellate Case: 13-1008     Page: 22     Date Filed: 04/23/2013     Entry ID: 4028263

Put simply, and taking as true Mr. **Van Deelen's** version of the facts as we must, we hold (unremarkably, we think) that a reasonable government official should have clearly understood at the time of the events at issue that physical and verbal intimidation intended to deter a citizen from pursuing a private tax complaint violates that citizen's First Amendment right to petition for the redress of grievances.

# IV

In addition to his petitioning claim, Mr. **Van Deelen** alleges a number of other First Amendment violations, including that defendants infringed his rights of speech, assembly (by denying him access to the county courthouse for the purpose of pursuing tax appeals), and association (by denying him access to courthouse employees). The district court viewed all such claims as "merely restat[ing]" Mr. **Van Deelen's** claim for interference with his right to petition and dismissed them because they, too, did not relate to matters of public concern. As we have indicated, however, the public concern test enjoys no place in the analysis of a private citizen's First Amendment claims. Accordingly, we reverse the district court's summary judgment on these counts as well. But, acknowledging that they were only briefly developed before us in a *pro se* brief, and that proper but as-yet unanalyzed grounds for summary judgment or qualified immunity may exist, we believe the prudent course is to ask the district court to conduct such examinations in the first instance on remand.

Beyond his First Amendment claims, Mr. **Van Deelen** also appeals the district court's summary judgment on his claims of conspiracy and violations of due process, as well as his claim against the County for adopting a policy or custom that caused him to be deprived of his federal rights. We have independently reviewed these claims and can report them to be without merit and thus properly dismissed by the district court. However, because we have renewed the original basis for supplemental jurisdiction by reviving and remanding Mr. **Van Deelen's** First Amendment claims, we vacate the district court's dismissal of his state tort claims and reinstate them to this suit. *See Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d 584, 590 n. 1 (10th Cir.1999).[9]

\* \* \*

To summarize, because the right of a private citizen to seek the redress of grievances is not limited to matters of "public concern," we reverse the district court's grant of summary judgment with respect to defendants Mr. Miles, Mr. **Johnson**, and Deputy Flory on Mr. **Van Deelen's** claim for interfering with his First Amendment right to petition and remand that matter for trial. With respect to these same defendants and Mr. **Van Deelen's** remaining First Amendment claims, we reverse and remand for the further proceedings we have outlined. We affirm the district court's grant of summary judgment on

1160   plaintiffs' various First Amendment claims as against defendants Sergeant *1160 Fangohr, Sheriff McGovern, and the County. We also affirm the district court's grant of summary judgment to all defendants with respect to Mr. **Van Deelen's** claims of conspiracy and violations of due process. Finally, we vacate the district court's dismissal of Mr. **Van Deelen's** state law claims.

Appellate Case: 13-1008     Page: 23     Date Filed: 04/23/2013     Entry ID: 4028263

*So ordered.*

[1] Additionally, all of Mr. **Van Deelen's** filings in the district court and this court were prepared *pro se* and are thus entitled to a solicitous construction. *Erickson v. Pardus,_____ U.S._____, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007); see also Riddle v. Mondragon,* 83 F.3d 1197, 1201-02 (10th Cir.1996). Mr. **Van Deelen** was, however, represented at oral argument before us by court-appointed counsel, Nicholas P. Heinke, whom we wish to thank for his generous and able *pro bono* advocacy.

[2] While Mr. **Van Deelen** claims the County reduced the assessment in response to his lawsuit, defendants contend that the reduction was a result of additional information provided to the Appraiser's office by Mr. **Van Deelen.**

[3] Mr. **Van Deelen** does not contest, however, that he has gone back to the courthouse for other non-tax-related business.

[4] *See, e.g., Garcetti v. Ceballos,_____ U.S._____,* 126 S.Ct. 1951, 1958, 164 L.Ed.2d 689 (2006) ("Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services."); *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ("[G]overnment officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."); *Waters v. Churchill,* 511 U.S. 661, 672, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); *City of San Diego v. Roe,* 543 U.S. 77, 80-84, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004).

[5] The Supreme Court has also recently indicated that, to merit First Amendment protection, a public employee's speech, though related to matters of public concern, must not have been made pursuant to his or her official duties. *See Garcetti,* 126 S.Ct. at 1959-62; *see also Casey v. West Las Vegas Ind. Sch. Dist.,* 473 F.3d 1323, 1328 (10th Cir.2007).

[6] *See Van Deelen v. Shawnee Mission Unified Sch. Dist. # 512,* 316 F.Supp.2d 1052, 1058-59 (D.Kan.2004); *Delkhah v. Moore,* 2006 WL 1320255, at *8-9 (D.Kan. May 15, 2006); *Howse v. Atkinson,* 2005 WL 1076527, at *6 (D.Kan. May 4, 2005). The district court also cited *McCook v. Springer Sch. Dist.,* 44 Fed. Appx. 896, 903-04 (10th Cir.2002) (unpub.), an unpublished and nonbinding decision of this circuit that, while ambiguous, allowed a private plaintiff's First Amendment claim in part on the ground that at least some of the speech at issue involved matters of public concern. *See id.* at 904.

[7] *See also Campagna v. Mass. Dep't of Envtl. Prot.,* 334 F.3d 150, 154-55 (1st Cir.2003); *Friedl v. City of New York,* 210 F.3d 79, 87 (2d Cir.2000); *Eichenlaub,* 385 F.3d at 282-84; *Gable v. Lewis,* 201 F.3d 769, 771-72 (6th Cir.2000); *Thaddeus-X,* 175 F.3d at 388-90; *Vickery v. Jones,* 100 F.3d 1334, 1346 n. 1 (7th Cir.1996); *cf. United States v. Reyes,* 87 F.3d 676, 680 (5th Cir.1996); *Dossett v. First State Bank,* 399 F.3d 940, 950 (8th Cir.2005).

[8] Even where the law is clearly established, a defendant may still be entitled to qualified immunity by claiming extraordinary circumstances, such as reliance on a state statute or regulation or the advice of legal counsel, and proving that he neither knew nor should have known the relevant legal standard. *Mimics, Inc. v. Village of Angel Fire,* 394 F.3d 836, 842 (10th Cir.2005). Defendants here, however, make no such claim of extraordinary circumstances, but instead simply assert that the law was not clearly established.

[9] Separately, appellees argue that Mr. **Van Deelen's** *pro se* brief suffers from "substantial deficiencies" sufficient to warrant summary dismissal of this appeal under *Garrett v. Selby Connor Maddux & Janer,* 425 F.3d 836 (10th Cir.2005). Though perhaps no model of appellate argument, Mr. **Van Deelen's** *pro se* brief suffers from far fewer deficiencies than appellees contend, and, happily, it does not come close to sinking to the low blows of the brief at issue in *Garrett,* which did "little more than attempt to impugn (without basis) the integrity of the district judge." *Id.* at 841.

Save trees - read court opinions online on Google Scholar.

Appellate Case: 13-1008　　　Page: 24　　　Date Filed: 04/23/2013　　　Entry ID: 4028263